[Cite as *State v. Ritchie*, 2018-Ohio-4256.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


STATE OF OHIO,                                    :

    Plaintiff-Appellee,                      :              CASE NO.  CA2017-11-155

                                  :              O P I N I O N
- vs -                                        10/22/2018

                                  :

ROBERT L. RITCHIE III,                           :

    Defendant-Appellant.                      :


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 16 CR 31982


David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Jeffrey W. Stueve, 301 East Silver Street, Lebanon, Ohio 45036, for defendant-appellant


**PIPER, J.**

{¶ 1}  Defendant-appellant, Robert Ritchie, appeals his convictions in the Warren County Court of Common Pleas for involuntary manslaughter and child endangering.

{¶ 2}  Ritchie's wife, Anna, was stepmother to Ritchie's four-year-old son, Austin.  In March 2016, Anna was caring for Austin while Ritchie was working.  As punishment for Austin's frustrating behavior, such as not eating his food, Anna forcefully submerged Austin in a bathtub of scalding water for several minutes.  This punishment occurred at

approximately 4:30 p.m., during which the water temperature reached between 130 to 140 degrees. While Austin fought Anna to escape the bathtub, she held him down in the water and dug her nails into the child's arm and shoulders to keep him from escaping. When Austin screamed and asked to get out of the bathtub, Anna "yell[ed]" at him to "shut up and be quiet."

{¶ 3} After several minutes, Anna observed that Austin was badly burned. She could see Austin's skin peeling off his legs and that the tops of his feet were bleeding. She then let him out of the bathtub, after which Austin's skin continued to peel off. Austin's feet also continued to bleed from his exposure to the scalding water.

{¶ 4} Anna dressed Austin, covering his burns with clothing, and applied ointment to his feet. Anna then covered Austin's bleeding feet with socks so that they would not bleed on his mattress. She then placed Austin in his crib and closed the door to Austin's bedroom at approximately 4:45 p.m.

{¶ 5} Anna called Ritchie at 5:00 p.m. and informed him that the child had sustained some burns, and texted Ritchie a few minutes later asking him to "please hurry." The two continued to exchange text messages regarding the burns and other topics, such as Anna wanting to eat, and Ritchie eventually returned home between 6:00 p.m. and 6:30 p.m.

{¶ 6} At that time, Anna appeared panicked and scared and told Ritchie that Austin's legs were peeling from the knee down and that she was scared about the extent of his injuries. Anna also asked Ritchie to check the temperature settings on the hot water heater. Ritchie investigated the water heater's setting by holding his hand under the hot water, determining that it was "hot." Ritchie adjusted the water temperature once, then again when he found that the water still ran too hot. However, Ritchie never entered Austin's bedroom to check on his son or his injuries, even after Anna later left the home from 6:45 p.m. to 10:00 p.m.

{¶ 7}    Instead, Ritchie got himself something to eat and then spent time constructing a toy made of Legos.  He also rested in his bedroom for a while, texted with Anna, and watched television.  However, Ritchie never checked on Austin or his injuries despite acknowledging that he heard Austin in his bedroom whimpering, whining, and cooing.  Throughout the remainder of the evening, Anna texted Ritchie multiple times regarding Austin's injuries and her realization that the water was "boiling."  Ritchie, however, was never compelled to give Austin any attention, instead, keeping Austin shut in his room.

{¶ 8}    The next morning, Ritchie entered his son's room and found Austin dead.  Approximately 28 percent of Austin's body sustained burns, including his buttocks, genital area, and legs.  Austin died of hypovolemic shock, which occurs when the body, after being severely burned, loses plasma fluids.  The reduction in blood volume caused damage to Austin's organs when his heart could not maintain a viable blood pressure.  Austin also suffered a contusion below his left eye, a lacerated lip consistent with blunt force trauma, and had bruises and marks on his shoulders and upper arms consistent with fingernails digging into his skin.

{¶ 9}    Anna admitted to detectives that she punished Austin by submerging him in the scalding water, though she attempted to minimize the resulting injuries.[1]  Ritchie also spoke with detectives and discussed his conduct, and lack thereof, the night Austin was burned.  A doctor later determined that had Austin received medical attention after he was burned, his expected survival rate would have been approximately 99 percent.

{¶ 10}    Ritchie was charged with involuntary manslaughter and endangering children, and a jury found Ritchie guilty on both counts.  The trial court merged Ritchie's convictions and sentenced him to seven years in prison.  Ritchie now appeals his convictions, raising the

---

1.  Anna was charged with murder, pled guilty, and was sentenced to life in prison with the possibility of parole.

following assignments of error. For ease of discussion, we will address Ritchie's second assignment of error first.

{¶ 11} Assignment of Error No. 2:

{¶ 12} THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS AND THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 13} Ritchie argues in his second assignment of error that his convictions for involuntary manslaughter and endangering children were against the manifest weight of the evidence and were not supported by sufficient evidence.

{¶ 14} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 15} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v.*

*Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 16} In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id*. Although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 17} Ritchie was convicted of involuntary manslaughter in violation of R.C. 2903.04(A), which provides, "no person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." The predicate felony underlying Ritchie's involuntary manslaughter charge was child endangering in violation of R.C. 2919.22(A), which prohibits a parent from creating "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶ 18} During trial, the state presented evidence that Ritchie created a substantial risk to Austin's health and safety by violating the duty of care and protection he owed his son. Specifically, the jury heard evidence that Ritchie understood the significant nature of Austin's injuries and took no action to render aid to Austin. If aid had been rendered, Austin's likelihood of survival was 99 percent and death would have not have been imminent.

**Recorded Interviews Played at Trial**

{¶ 19} The jury viewed the recorded police interviews between detectives and Anna

and detectives and Ritchie, during which Anna and Ritchie separately described the details of Austin being burned and what occurred during the time before Austin was found dead in his crib.[2]

{¶ 20} During her interview with detectives, Anna freely admitted that she had a low tolerance for children and ultimately admitted that she used the scalding water to punish Austin. Anna told one detective that while she knew Ritchie had children before she married him, she never felt "ready to fully take on the responsibility of being" a stepmother and that she is not good with children because they "overwhelm" and "annoy" her. Anna told the detective that her father warned her in the past that she needed to be more patient with children after observing her interactions with Austin and the punishment she inflicted upon him. Specifically, Anna's father told her to have more patience with Austin after she spanked him for crying and being afraid when he observed a serious verbal argument between her and Ritchie.

{¶ 21} Anna told the detective that Ritchie had also told her that she had "very little patience" for children and that her temper "boils" over quickly. Anna admitted that she had grown jealous of Austin because Ritchie paid more attention to Austin than her. She also stated their marriage had gone "downhill" since Austin left his biological mother's care and moved in permanently with her and Ritchie. Anna then told the detective that her "anger got the better" of her when Austin was in the bath.

{¶ 22} When asked to describe what occurred on the day of the incident, Anna told the detective that she awoke on the day of the incident at approximately 11:45 a.m. and

---

2. This court has viewed the full interviews for both Anna and Ritchie, including the moments of silence during which Anna is not being questioned by the detectives. The jury was shown the moments of silence at the request of defense counsel, and the trial court expressed its hope that this court also view the moments of silence, which it has done.

waited for Austin to wake up.[3]  The two then watched a movie.  Anna told the detective that she decided to give Austin a bath around 4:25 p.m. and admitted that she was "probably a little too rough with" Austin during the bath because of his frustrating behavior, such as wanting to get out of the bathtub and reaching for her.  Eventually, Anna admitted to the detective that she intentionally made the water hot because she was frustrated with Austin, and that placing Austin in the scalding water was "a form of punishment."

{¶ 23}  Anna told the detective that she held Austin down in the bathtub "for quite a while" so that he could not get out.  During this time, Austin was "screaming" and telling Anna that the water was "hot."  Anna was angry with Austin for "screaming" and "grabbing" for her and held him down in frustration because he was trying to get out of the bathtub.  Anna told the detective that she held Austin down in the scalding water for five to eight minutes.

{¶ 24}  Anna stated that when she saw the steam coming off the water, she asked herself, "Oh my God, what have I done?"  Anna told the detective that Austin was "whining a lot" and that she realized that the water was "scalding hot * * * like hotter than anything" she had ever felt.  She also noticed that Austin's skin had peeled off and was floating in the water, and that Austin's feet were red and bleeding.

{¶ 25}  Anna told the detective that she took Austin out of the bathtub and dressed him.  She put socks on Austin's bleeding feet to hide the injuries to his feet and to stop blood from staining Austin's bedding.  Anna also stated that Austin's legs looked like they had been badly sunburned and that when she removed Austin from the water, his skin was in the bathtub.

{¶ 26}  Anna estimated that she put Austin to bed at 4:45 p.m., although that was not his normal bedtime, because she wanted to avoid Ritchie yelling at her for Austin's injuries.

---

3. During Ritchie's trial, Anna testified that she believes Austin woke up that morning around 8:00 a.m. or 9:00 a.m. but she ignored him so that she could sleep until noon.

Anna also admitted to the detective that she did not check on Austin after putting him in his room and closing the door. Anna expressed that she felt "so guilty" and that she "should've checked" on Austin because he was "crying." Anna also told the detective that she could hear Austin in his room talking to himself, that he cried for two to three hours, and that Austin was still whining when Ritchie got home from work.

{¶ 27} Anna told the detective that when Ritchie came home, Austin cried and wanted to come out of his bedroom. However, neither Anna nor Ritchie allowed Austin out of his room, nor did they check on him. Instead, Anna told Ritchie to let Austin "whine it out" rather than go into the room and check on him despite her explaining to Ritchie that Austin was burned in the bathtub. When asked what information Ritchie had about Austin's injuries, Anna told the detective that after Ritchie arrived home, she told him that Austin's feet were bleeding and that his legs were burned. At Anna's request, Ritchie also checked the setting on the water heater and Ritchie turned it down because when he first tested the water temperature, it was "scalding hot."

{¶ 28} Anna also told the detective that when Ritchie suggested that they check on Austin later in the evening, she told him that she did not want Austin waking up and screaming; instead, Anna wanted "silence." Anna told the detective that she left the house around 6:45 p.m. with a friend, and that Ritchie later informed her that he could hear Austin making noise in his bedroom until 10:00 p.m.

{¶ 29} Anna told the detective that she awoke at 5:00 a.m. on the morning after Austin had been burned and that around 7:00 a.m., she went to the grocery store and library. She did not return home until Ritchie called her to tell her that Austin was dead. Throughout her interview, Anna expressed multiple times that she and Ritchie should have checked on Austin, that not doing so was "neglectful," and that she felt guilty for not checking on Austin.

{¶ 30} The jury also observed the interviews between detectives and Ritchie. Ritchie

explained that on the day Austin was burned, he was working until 5:00 p.m. Although Anna had already texted him information regarding Austin's burns, Ritchie went shopping after work rather than return directly home. Ritchie told the detective that he returned home around 6:30 p.m., and that he could hear Austin "whining" and talking to himself.

{¶ 31} Ritchie told the detective that he asked Anna about the bath incident and she told him that Austin was in the water, it appeared as if he was sunburned, and that skin had fallen off his body. Anna also told Ritchie that Austin's skin might have "little welts, like a blister." Ritchie told the detective that Anna was unsure how "bad" the burns would be and that she had "freaked out" when she started to see Austin's skin falling off in the bathtub. However, when asked, Ritchie confirmed that he never once checked on Austin to assess his injuries.

{¶ 32} Ritchie told the detective that Anna had explained that the water was "really hot" and that when she tried to drain the bathtub, the water was so hot that it opened an existing sore on her hand. After speaking with Anna, Ritchie checked the water heater temperature, which was on the highest setting. Even after turning the setting down once, Ritchie determined that the water was "still pretty hot," causing Ritchie to turn it down again. Given that Anna was leaving the house that evening, Ritchie told her that he would "keep an ear open for" Austin.

{¶ 33} After Anna left, Ritchie continued to hear Austin until around 10:00 p.m. and then did not hear anything after that time. Ritchie told the detectives that he was awake until 12:30 a.m. but did not check on Austin at all until approximately 9:30 a.m. the next morning. Ritchie explained that he did not check on his son because he wanted Austin to rest, and that if he would have gone into the child's bedroom, Austin would have been "up all night." The detective asked Ritchie if he knew the evening before Austin died that Austin was burned and that his skin was peeling "at the very least." Ritchie responded "yes."

{¶ 34} Ritchie also told the detective that Anna had "very short patience" with Austin and that Austin put "a lot of strain" on Anna. Ritchie also stated that Anna displayed anger toward Austin and that they had talked about getting Anna help for her stress and anger management issues. Despite knowing of Anna's anger issues and hostility toward Austin, Ritchie admitted that he did not question Anna further about the incident and did not check on Austin throughout the night. Ritchie told the detective that he should not have taken Anna's word that the burns were not serious, or that Austin would be "fine."

{¶ 35} Ritchie also told the detective that before Anna left the home on the morning he discovered Austin's body, she told him to update her on Austin's condition and reminded him of Austin's bleeding foot. Instead of checking on Austin right away, Ritchie went back to sleep. Multiple times throughout the interview, Ritchie stated that he should have checked on Austin.

**Medical Evidence**

{¶ 36} The state presented testimony regarding Austin's injuries and cause of death from the forensic pathologist who performed the autopsy of Austin's body. The pathologist testified that Austin had several injuries in addition to his burns. These injuries included a bruise beneath Austin's eye, a cut on his lip, and fingernail punctures on Austin's upper right arm. Austin's left arm was bruised, and the wound was consistent with broken blood vessels caused by the application of pressure. [4]

{¶ 37} The pathologist also testified that Austin's body contained several different burns, including large fluid-filled blisters on his genitals and buttocks. Other parts of Austin's body were burned so badly that his skin had fallen off, including the bottoms of Austin's feet, his legs, and portions of his thighs and buttocks. The pathologist testified that Austin's

---

4. Anna confirmed during her testimony that some of these injuries were incurred as Austin fought to escape the bathtub.

injuries were consistent with a "scald type burn" of the second degree.

{¶ 38} Austin also had black "vomitous" on his face, which the pathologist explained was the result of Austin's stomach lining hemorrhaging. Once Austin's body started to shift his blood supply to essential organs, his stomach lining began to die and hemorrhage. Austin then vomited the black substance consisting of partially digested blood. This same black vomitous was found in Austin's crib and on his clothing before he was removed from his bedroom by emergency responders.

{¶ 39} The pathologist testified that the remainder of the autopsy, during which Austin's internal organs were examined, demonstrated that Austin did not have any underlying condition that would have made him susceptible to death. Nor did Austin's toxicology reports indicate that he had ingested any narcotics or medications.

{¶ 40} The pathologist then explained the way Austin died. Once Austin's skin was burned, his skin cells started dying and his blood vessels became "leaky." Because so much of Austin's body was burned, the leaking vessels caused his blood supply to become "drastically reduced." The pathologist compared the blood loss to "exsanguination," a "severe traumatic injury," or "cutting of a large vessel where blood is coming out of the blood stream."

{¶ 41} The result of Austin's blood loss was hypovolemic shock. As the blood loss continued, Austin's heart could not maintain a normal blood pressure and his blood vessels no longer contained adequate fluid. Austin's blood could not travel to his organs, and his body suffered multisystem organ failure. Austin's heart would have pumped harder to compensate for the reduction of blood vessels until it, along with his other vital organs, shut down causing Austin's death. Ultimately, the pathologist testified that Austin's cause of death was hypovolemic shock predicated upon "scalding injuries," and that the child would have survived had he received medical attention.

{¶ 42} The state then presented expert medical testimony from a doctor who specializes in pediatric burn injuries. The doctor testified that approximately 28 percent of Austin's body was burned, and that at the time of death, the burns were second-degree. The doctor explained that had Austin survived, the vast majority of the burns would have deepened to third-degree burns, requiring skin grafts to 22 percent of Austin's body. The doctor testified that some of the burned areas were caused by water splashing on Austin, and that other burns were consistent with Anna's description of holding Austin down in the scalding water.

{¶ 43} The doctor testified that the common treatment for hypovolemic shock, which is a curable condition, includes administering fluids to the patient through an IV. The doctor explained that Austin would have begun losing fluid within the hour after he was burned, and that he would have lost the most fluid three to five hours after being burned. However, Austin was still treatable after several hours, and the doctor testified that in his experience, he has administered fluid therapy to burn patients six to 12 hours after they were burned. The doctor estimated that had Austin received medical attention, his expected survival rate was 99 percent.

**Digital Forensic Evidence**

{¶ 44} The state also called a detective who performs digital forensics, such as extracting data from computers and cellular phones. The detective testified that he performed an extraction of data on Anna's phone, specific to text messages she and Ritchie shared on the day and evening Austin was burned. Through the messages, Anna informed Ritchie that Austin was "grumpy" that afternoon and had thrown food and a dish at Ritchie's stereo. Anna told Ritchie that Austin "needs to know that being a brat has consequences."

{¶ 45} Later in the evening, and once Anna left the house with her friend, Anna and Ritchie continued to text each other. At one point, Anna texted "I hope that Austin's foot isn't

too bad tomorrow. Sigh. I'm worried about that." Ritchie answered, "Well me and you both. I walked out there earlier and he was 'cooing' so I think the initial shock has past [sic]." Anna then texted, "I feel bad that that happened. I honestly thought he was just saying it to be a butt . . . Nope. That water was scorching." Ritchie answered, "you had no way of knowing. It's like the boy who called wolf. He called wolf falsely so many times, when something was wrong no one believed him." Anna then texted that she had ignored Austin when he was screaming, "but when I noticed dry skin and steam off the water I was like ok get out. I feel bad because when I stuck my hand in there I got burned bad too." Anna later reiterated that the water was "scorching" and stated her hope that her parents did not get upset with her for Austin's burns.

{¶ 46} Anna continued to express guilt for the incident, and also restated that Austin's foot bled. She recounted putting ointment on Austin's foot and putting socks on to "keep it from bleeding all over his mattress." Anna also informed Ritchie that she felt "sooooo bad though that it happened but I swear to [G]od I didn't know it was that fucking boiling hot." Ritchie then suggested to Anna that she slow down when interacting with Austin, and called the incident an "accident." He then told Anna, "it's really ok. He's alive. That's what is really important. And apparently he can still walk so that's good to[o]."[5] The text message exchange ended at 9:21 p.m., approximately 39 minutes before the last time Ritchie recalled hearing Austin make noise in his bedroom and approximately three hours before Ritchie went to bed for the night.

---

5. During cross-examination, at the request of Ritchie's counsel, the detective also read other text messages between Anna and Ritchie from the day before Austin was burned. In one such text, Anna tells Ritchie how frustrated she was with Austin, who she said was acting like a "jerk." Anna explained that she turned on the television so that Austin would "shut up" and stop "being a brat." Anna also asked Ritchie to bathe Austin when Ritchie returned from work and to put him to bed immediately for his poor behavior. Anna instructed Ritchie, "he is not to stay up tonight. Period. Bath then bed. * * * He needs his ass busted too if he whines, acts up, screams, or bangs on the door about the bath. * * * Seriously if he so much as whines he needs his ass busted." The record indicates that Austin continually exhibited a serious dislike of baths, which Ritchie and Anna believed was the result of Austin having been sexually abused during baths when in his biological mother's care before he came to live with Anna and Ritchie.

**Anna and Ritchie's Testimony at Trial**

{¶ 47} Anna appeared at trial as a witness for the defense. She testified that it was not a secret in her household that she was "handling Austin much too roughly and inappropriately." Anna also testified that Ritchie "was aware that [she] had a lot of anger, and frustration, and resentment about having Austin" in the home.

{¶ 48} Anna testified that she called Ritchie at 5:00 p.m. on the evening Austin was burned and told him that she had burned Austin in the bathtub. Anna recalled telling Ritchie specifically that the tops of Austin's feet were red, bleeding, and peeling. Approximately seven minutes later, Anna texted Ritchie to "please hurry." However, Ritchie did not arrive home for over an hour.

{¶ 49} Anna also testified that she met Ritchie in the parking lot of their apartment building when he finally arrived home, and that she was pacing and scared. She recounted telling Ritchie that Austin was burned, his feet were bleeding, and that his legs were peeling from the knee down. Anna testified that when she told Ritchie the information about Austin, she was "very scared" and that Ritchie could see that she was "getting panicky and scared."

{¶ 50} Anna also established that despite knowing Austin was burned in the bathtub, his feet were bleeding, and his skin was peeling from his body, Ritchie did nothing to check on Austin or inquire of his injuries or well-being upon entering the home. Anna testified that as she and Ritchie continued to talk that evening, Austin was awake, and she and Ritchie heard Austin crying and "asking to be let out." However, Ritchie proceeded to eat deviled eggs Anna made earlier that day rather than check on his son.

{¶ 51} Anna further testified that once she left with her friend, Ritchie was home alone with Austin for over three hours. Anna learned that Ritchie did not check on Austin while she was away despite his knowing that Austin was awake and despite his hearing noises from Austin's bedroom. Nor did Ritchie check on Austin after Anna returned home that night.

{¶ 52}   Ritchie testified in his own defense.  Ritchie told the jury that Austin was his "best friend" and that "any moment I wasn't at work I spent with my boy."  However, on cross-examination, Ritchie testified that the last time he saw Austin alive was when he put Austin to bed the night before he was burned.  Ritchie admitted that he did not attempt to see Austin on the day he was burned, despite leaving work at 5:00 p.m. and hearing Austin awake in his room until 10:00 p.m.  Nor did Ritchie attempt to see Austin the next morning until he finally checked on him at 9:30 a.m.

{¶ 53}   Regarding the day of Austin's burns, Ritchie testified that before he made the decision to stop at Walmart after work, Anna had already told him that Austin had been burned in the bathtub, Austin's skin had peeled, Austin's skin may blister, and that when she touched the water, a sore on her hand opened and started to bleed because of the scalding water.  When asked why he did not check on Austin immediately after returning home and after knowing that Austin had been burned, Ritchie told the jury that Anna "said he was fine.  Said he was okay, just let him rest."

{¶ 54}   Ritchie also told the jury that he was physically afraid of Anna and that she had put her hands on him in "anger" at least two to three times.  However, Ritchie later testified on cross-examination that had he known the severity of Austin's injuries or that he could not trust Anna, he would have called 9-1-1 and that he would have "forcefully" moved Anna out of the way if she tried to stop him from checking on Austin.

{¶ 55}   Ritchie also admitted that when he arrived home, Anna "seemed a little antsy or upset."  He further testified that Anna told him about Austin's injuries again and that the two discussed the setting on the water heater.  Ritchie testified that the water was "pretty hot" when he tested it, and that he turned down the settings on the water heater twice because the water was too hot.

{¶ 56}   In direct contradiction to what Ritchie told detectives on the morning he

discovered Austin's body, Ritchie testified that Austin was "quiet the whole time" on the night he was burned and that he did not hear Austin ask to come out of his bedroom. Ritchie even told the jury that if he *had* heard Austin say, "I want to get up," that he would "have kicked the door down. If he ever yelled for me and I knew he was yelling, I'd bust the door down and see what he needed." However, during cross-examination, Ritchie admitted that he heard Austin making noises throughout the evening and into the night yet failed to open the door to check on Austin, let alone kick the door in.

{¶ 57} Ritchie specifically testified that he walked up to Austin's door to listen on multiple occasions the night the child was burned, and admitted that Austin was making noise in his room until 10:00 p.m., including whimpering and whining. When asked why he did not enter Austin's room after hearing the child whimpering and whining, Ritchie testified that he was trying to build a Lego toy to later present to Austin.

{¶ 58} Although he knew that Austin had been in his room alone and awake from 4:45 p.m. until 10:00 p.m., Ritchie testified that it did not "cross [his] mind" that Austin may have wanted food, water, or to have his diaper changed. Despite knowing that his son was injured, Ritchie never attempted to sooth Austin in a manner that had worked in the past to help the child sleep, such as reading him a bedtime story. Instead, Ritchie testified that he did not want to disturb Austin because if Austin was asleep and woke up, it was difficult to get him back to sleep.

{¶ 59} Ritchie acknowledged during cross-examination that he received each of Anna's text messages while she was away from the home, including that Austin had screamed to get out of the water, that Austin's skin was falling off, that his foot was bleeding, and that the water was "fucking boiling." Ritchie then admitted that he did not check on Austin even after reading Anna's text messages because he "just wanted to lay down."

{¶ 60} Despite his contention that be believed Anna when she told him that Austin

would be "fine," and that Anna dissuaded him from checking on Austin as the night progressed, Ritchie admitted on cross-examination that Anna's text messages described "significant injuries" to Austin. Ritchie also admitted he was aware of Anna's tendencies to be overly aggressive when it came to disciplining Austin.

**Ritchie's Failure to Uphold the Duty He Owed Austin**

{¶ 61} After hearing from Anna that the water was "boiling," confirming for himself that the water heater temperature was set too high, and hearing the child whining in his room for hours, Ritchie did nothing to gauge the severity of Austin's injuries at the hand of a woman Ritchie *knew* was angry at Austin and who had a history of punishing him physically. Despite his self-proclaimed knowledge that Austin's injuries were "*significant*," and after hearing from Anna that Austin needed to know there were consequences for his actions, Ritchie never inquired about, or investigated, Austin's injuries.

{¶ 62} The record is replete with evidence Ritchie ignored the real possibility that Austin needed medical attention. While Ritchie's defense included that Austin was covered in clothing so that his burns could not be seen even if he had checked on the child, the photographs of Austin's body reveal the undeniable and wide-spread nature of Austin's burns as well as the black vomitous that covered the child's mouth, nose, shirt, and crib. If Ritchie had only looked at Austin's feet, which he knew had bled from being submerged in "boiling" water, he would have seen the extent of the burns and sought medical attention.

{¶ 63} The medical evidence clearly established that Austin was alive and suffering for several hours and that his condition was deteriorating at a rapid pace during the hours that Ritchie was home alone with the child. However, Ritchie did nothing to assure that Austin received the medical treatment that would have saved his life. Instead, Austin was in his crib, suffering alone, for almost 17 hours after he sustained burns to 28 percent of his body, 22 percent of which would have required skin grafting had he survived. Ritchie was in

the home and responsible for Austin's care for 15 of those 17 hours.

{¶ 64} To explain his inaction, Ritchie told the jury that he did not check on Austin because he believed Anna when she said Austin was "fine," he was too busy building a Lego toy, he wanted to lie down, he wanted to sleep, and he did not understand the nature of Austin's injuries. However, the jury heard evidence that patently established Ritchie's knowledge of the "significant" nature of Austin's injuries. Moreover, the jury heard evidence regarding Ritchie's knowledge of Anna's past behavior and feelings toward Austin that would make any parent question, at a bare minimum, Anna's minimalization of Austin's injuries despite the known facts and circumstances.

{¶ 65} As a direct result of Ritchie's failure to fulfill the duty he owed his son, Austin succumbed to his injuries even though the probability of survival with medical attention was 99 percent. For these reasons, Ritchie's convictions for child endangering and involuntary manslaughter were supported by sufficient evidence and were not against the manifest weight of the evidence. Ritchie's second assignment of error is, therefore, overruled.

{¶ 66} Assignment of Error No. 1:

{¶ 67} THE TRIAL COURT VIOLATED THE APPELLANT'S PROCEDURAL DUE PROCESS RIGHTS.

{¶ 68} Ritchie argues in his first assignment of error that he was denied procedural due process rendering his trial unfair.

{¶ 69} The right to procedural due process is guaranteed by the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution. At a minimum, due process requires notice and the opportunity to be heard. *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879. A hearing before judgment, with full opportunity to present all evidence and arguments that the party deems important, is vital under the guaranty of due process of law. *State v. Koller*, 12th Dist.

Warren No. CA2013-07-069, 2014-Ohio-450, ¶ 25. While the constitution does guarantee an individual's right to a fair trial, "it does not guarantee that the trial be error-free and perfect." *State v. Collins*, 12th Dist. Butler No. CA90-10-208, 1991 Ohio App. LEXIS 5708, *14 (Dec. 2, 1991).

{¶ 70} According to Crim.R. 33(A)(1), a new trial may be granted due to "irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial." A reviewing court will not disturb a trial court's decision granting or denying a request for new trial absent an abuse of discretion. *State v. Weaver*, 12th Dist. Butler No. CA2009-01-022, 2009-Ohio-5923, ¶ 43. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Bennett*, 12th Dist. Butler No. CA2017-09-138, 2018-Ohio-3623, ¶ 27.

{¶ 71} Ritchie made multiple requests throughout the five-day jury trial for a mistrial; each request overruled by the trial court. Ritchie argues on appeal that he was denied procedural due process given several perceived errors during his trial and "unreasonable decisions" by the trial court.

**Austin's Family and the Jury**

{¶ 72} Ritchie first argues that he was denied due process because Austin's family members were permitted to sit among and converse with potential jurors. "Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. * * * Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 54.

{¶ 73} A new trial may be granted for misconduct involving the jury where the

substantial rights of the defendant have been materially affected. R.C. 2945.79(B). "Conversations by a third person with a juror during the progress of a trial for the purpose of influencing the verdict may invalidate the verdict, but where there is nothing in the record to demonstrate that the decision might have been influenced by such conversation, the refusal of the trial court to grant a new trial will not be disturbed." *State v. Hipkins*, 69 Ohio St.2d 80, 83 (1982).

**{¶ 74}** During voir dire, Ritchie's defense team suggested to the trial court that potential members of the jury may have overheard Austin's biological mother and other members of Austin's family talking after the trial court referenced children being removed from their homes. During a sidebar, defense counsel indicated that the potential jurors were sitting a row behind the family members and heard Austin's family conversing and observed Austin's mother become visibly upset. However, Ritchie's defense team specified to the trial court that their only request was that the family members be moved. One of Ritchie's attorneys then told the trial court that the issue "seems to have corrected itself" because the family members had left the courtroom of their own accord.

**{¶ 75}** Even though Ritchie now claims that he was denied a fair trial because of the potential jurors possibly overhearing comments from Austin's family, the record does not indicate such occurred. Ritchie's attorneys specifically stated during the sidebar that they had not heard the conversation that Austin's family had, nor did they indicate that they ever saw jurors speaking or interacting with Austin's family. The defense team's suggestion that the conversation was specific to Austin leaving his mother's care is pure speculation and there is nothing in the record to establish what the conversation entailed or even if the potential jurors heard what was said.

**{¶ 76}** Moreover, there is nothing in the record to suggest that the potential jurors who sat behind Austin's family were actually seated on the jury. Assuming arguendo that such

potential jurors were seated on Ritchie's jury, there is nothing in the record to demonstrate that the potential jurors were influenced by a conversation regarding Austin being removed from his mother's home. Ritchie's counsel had the opportunity to explore the matter during voir dire and chose not to pursue the issue. Counsel also did not believe the situation required polling the potential jurors. Thus, the need to speculate further is unwarranted.

{¶ 77} The record lacks any evidence to demonstrate that the verdict was influenced because of potential jurors observing Austin's mother upset or possibly overhearing a conversation between the family. Thus, Ritchie has failed to demonstrate that he was prejudiced by improper influence on the jury and his claim that he was denied due process is meritless.

### Mischaracterization of Evidence

{¶ 78} Ritchie also claims that he was denied due process because the trial court allowed the prosecution to mischaracterize evidence. Specifically, Ritchie argues that the trial court permitted the state to mischaracterize Anna's text message to Ritchie in which she asked him to "please hurry" after his workday ended. The state referenced the text as an indication that Anna was communicating with Ritchie her growing concern over the severity of Austin's injuries. According to Ritchie, however, the *only* meaning of this message was that Anna wanted Ritchie to come home so that they could eat given that the following text message Anna sent was "I'm ready to eat." However, the jury was free to determine the meaning or possible meanings of Anna's text message.

{¶ 79} The jury heard evidence that the "I'm ready to eat" text was sent six minutes after Anna asked Ritchie to hurry home. Thus, the jury could have reasonably inferred that Anna was introducing a new topic with her subsequent text rather than asking Ritchie to hurry only because she was hungry. Moreover, Anna testified that she sent the 'hurry home' text because she planned to leave with her friend soon, wanted relief from taking care of Austin,

"and then I was scared because of what happened because I had text[ed] him after it had happened. I was – honestly I was scared." Further, Anna testified on cross-examination that she sent the "please hurry" text because she was "starting to get scared" and that she wanted Ritchie to help her with the situation. Thus, there is no indication that the state mischaracterized the text message where Anna, herself, testified that there were various reasons she sent it.

{¶ 80}   Ritchie also claims that the state mischaracterized evidence regarding a text message Anna sent him reporting Austin's continual whining and screaming. Ritchie argues that Anna's text was specific to Austin not wanting to have a bowel movement in the toilet. At 5:20 p.m., Anna texted Ritchie that Austin asked her if he could "poop in [the] toilet," which was notable given that Austin was in the process of being potty-trained. However, Anna reported that Austin tried to use the toilet but then screamed. Six minutes later, she used the present tense to inform Ritchie that Austin "won't quit whining and screaming so ignore him."

{¶ 81}   Again, and while the text message regarding Austin whining and screaming followed a text about his trying to use the toilet, enough time had passed between the messages to raise an inference that Anna had switched topics once again. Moreover, and again, Anna testified about the context of her text message regarding Austin's whining and screaming and that she sent the message because she wanted to place Ritchie on notice that Austin was screaming "because he was injured." Thus, the jury was given enough information and evidence from which it could decide what the text messages meant. As such, the state did not mischaracterize the evidence, and Ritchie was not denied due process.

### Inaccurate Transcript

{¶ 82}   Ritchie next claims that he was denied due process because he was provided an inaccurate transcript of proceedings, which he used when cross-examining a detective

during the state's case-in-chief.

{¶ 83}  The record indicates that before Ritchie was found guilty at the trial herein, he had two previous trials.  The first trial ended in a hung jury, and the second trial ended in a mistrial when Ritchie became ill during the prosecution's case-in-chief when the state published to the jury the autopsy photographs of Austin's body.  The same state's witnesses appeared at the previous trial, and their testimony was recorded.  Before the most current trial, Ritchie requested a transcript of the testimony of a police lieutenant who encountered Austin's body on the morning Ritchie discovered Austin in his crib.  A transcript was then provided to Ritchie as prepared by the trial court's court reporter.

{¶ 84}  During the current trial, Ritchie cross-examined the lieutenant regarding what other responding officers told him about Austin's body and whether Austin's burns were immediately identifiable given the clothed state of the child.  During Ritchie's cross-examination, the court reporter informed the trial court that an error occurred, and the transcript Ritchie was using to impeach the witness of his prior statements was a transcript of a different witness from the previous trial.  The court reporter had transcribed and given Ritchie the copy of another witness' testimony by mistake.  The trial court explained the error to the jury and instructed it to disregard the entire cross-examination of the lieutenant given the error.  The trial court then recessed.

{¶ 85}  During recess, Ritchie moved for a mistrial.  He argued that the lieutenant's cross-examination was a pivot matter because what was not obvious to the emergency responders when they first saw Austin's body also would not have been obvious to Ritchie had he checked on Austin.  Ritchie claims the testimony would therefore establish that he would not have known about Austin's injuries even if he had checked on him.  Ritchie's counsel told the trial court that the defense had relied upon the incorrect transcript in preparing the defense, and claimed the transcript affected the way in which the states'

witnesses were to be cross-examined.

{¶ 86} The trial court denied Ritchie's motion for a mistrial, instead finding that it had cured the error through its explanation to the jury and its instruction to disregard the cross-examination. We find no abuse of discretion in this decision. Curative instructions "are presumed to be an effective way to remedy errors that occur during trial." *State v. Trzeciak*, 12th Dist. Brown No. CA2014-06-010, 2015-Ohio-2219, ¶ 24. A jury is presumed to follow the court's instructions, including curative instructions, and the record reveals no evidence that the jury failed to follow the trial court's instructions. *State v. Tyree*, 12th Dist. Fayette No. CA2016-09-012, 2017-Ohio-4228.

{¶ 87} The trial court clearly explained to the jury that through no fault of the defense, Ritchie had received an incorrect transcript of a prior proceeding and instructed the jury to disregard the cross-examination. The record establishes that each individual juror then insured that it would follow the trial court's instruction, disregard the cross-examination, and would not hold the mistake against the defense in any way. Ritchie was then permitted to begin anew his cross-examination of the lieutenant using the correct transcript of the lieutenant's prior trial testimony.

{¶ 88} While Ritchie received an incorrect transcript, the error did not deny him a fair trial. The jury heard testimony regarding the condition of Austin's body and whether his burns were observable by first responders. Through cross-examination, Ritchie was able to question whether Austin's burns were visible or whether they were only seen once his clothing was removed. During Ritchie's opening statement, Ritchie informed the jury that it would hear evidence that had he checked on Austin, he would have merely seen his son sleeping. During closing argument, Ritchie argued that he would not have been able to see any burns had he checked on Austin, and instead, would have only seen "his son laying on his belly in that crib appearing to be asleep." Thus, the course of Ritchie's defense did not

change throughout trial, and Ritchie was able to attempt impeachment of the state's witnesses. Ritchie challenged the notion that Austin's burns were visible despite the error in receiving the incorrect transcript.

{¶ 89} Moreover, we note that whether Austin's burns were visible to the first responders is irrelevant because Ritchie never opened the door to Austin's room. What the first responders could or could not see did not change Ritchie's duty to inspect Austin's injuries or inquire as to his need for care. Whether Austin's burns were or were not visible to *others* did not alleviate Ritchie's duty to assess Austin's well-being or to determine Austin's need for care based on *all of the information* Ritchie had.

{¶ 90} Even if, and assuming arguendo, that Austin was covered by his pajamas and a blanket, Ritchie knew for a fact that Austin's feet were burned to the point of bleeding, his legs were burned, and his skin was peeling off his body. Anna told Ritchie that she had clothed Austin before putting him to bed, including putting socks on Austin's burned feet, so that Ritchie would have expected his son's burns to be covered by clothing and socks. This expectation never changed, regardless of what emergency responders observed upon first seeing Austin's body.

{¶ 91} Moreover, and regardless of whether Austin's torso was clothed and covered with a blanket, Ritchie would have been able to see the bruise on Austin's face and the cut on his lip had he checked on Austin. Anna did not discuss these injuries with Ritchie, and they would have come as a surprise had Ritchie checked on Austin. These observable injuries would have led Ritchie to inquire as to Austin's overall well-being, including how badly the child was burned under his socks and clothing.

{¶ 92} However, what Ritchie would or could have seen had he observed Austin in his crib is irrelevant given his failure to check on Austin. Thus, there is no indication in the record that Ritchie was denied due process, as he was not prejudiced by the inadvertent receipt of

the incorrect transcript and its subsequent use.

**Expert Testimony**

{¶ 93} Ritchie also claims that he was denied due process because the trial court allowed the doctor who specializes in pediatric burns to testify as an expert without first having a proper foundation. Specifically, Ritchie claims that the doctor could not testify as an expert because the doctor had not examined Austin's body, did not speak to the pathologist who performed the autopsy, did not speak to Austin's physicians, and essentially did not have a complete history of the circumstances surrounding Austin's death.

{¶ 94} The decision to admit or exclude expert testimony lies within the sound discretion of the trial court. *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶ 59. After being vetted as an expert under Evid.R. 702, a witness is required to base his or her opinion on facts or data "perceived by the expert or admitted in evidence at the hearing" under Evid.R. 703. Opinion testimony by an expert, therefore, must be based on facts within the witness' own personal knowledge or upon facts shown by other evidence. *State v. Maher*, 12th Dist. Fayette No. CA2016-10-015, 2017-Ohio-7807. Evid.R. 705 allows an expert to testify about his or her opinion only after disclosing the underlying facts or data supporting such opinion. Thus, the evidentiary rules are satisfied when an expert bases his or her opinion on facts he or she perceived, or data admitted into evidence. *Id*.

{¶ 95} The record clearly indicates that the trial court did not abuse its discretion in allowing the doctor to testify as an expert specific to Austin's medical condition and cause of death. The doctor had 37 years of experience as a surgeon in burn care treatment, including extensive time with Shriners Hospital for Children. He treated over 500 pediatric burn patients each year, many of whom suffered scald injuries. The doctor also published scholarly works on critical care and the treatment of burns, including burn management and related outcomes.

**{¶ 96}** While the doctor did not personally observe Austin's body and confer with others who were involved in the medical investigation of Austin's death, the doctor testified that not doing so did not impact his ability to render an opinion as to Austin's injuries or cause of death. The doctor testified that before reaching his conclusions, he viewed the autopsy and crime scene photographs, and reviewed reports from those involved in the medical investigation. The doctor also reviewed the transcripts of Anna and Ritchie's interviews with detectives. The state introduced these materials and discussed them in detail before the doctor testified so that the jury was well-aware of the data and facts upon which the doctor based his opinions.

**{¶ 97}** While Ritchie argues on appeal that the doctor could not have formed conclusive opinions without examining the body and without conferring with others to create a detailed history, the record indicates otherwise. The doctor's testimony was consistent with the pathologist's testimony regarding the approximate amount of Austin's body that was burned, to what degree it was burned, Austin's matter of death, and whether Austin would have survived had he received medical attention.[6]

**{¶ 98}** If anything, the fact that the doctor did not personally view Austin's body or confer with other investigators would have created a question of what weight to give the doctor's opinions, not whether such testimony was admissible. The jury was free to question the way in which the doctor formed his opinions and upon what evidence the doctor relied. However, the trial court did not abuse its discretion by permitting the doctor to testify as an expert given his extensive knowledge and experiences with pediatric burn injuries and based

---

6. The pathologist testified that Austin sustained second-degree burns from being scalded in the water. The doctor agreed, but explained that the burns would have continued to deepen had Austin survived. In the doctor's experience with how burns develop over time, approximately 22 percent of Austin's body would have had incurred third-degree burns requiring skin grafting to fully heal had the child lived.

upon evidence that was introduced at trial. As such, Ritchie was not denied a fair trial because of the doctor's expert testimony.

### Cross-Examining Anna

{¶ 99} Ritchie also claims that he was deprived of due process because the trial court denied him the ability to re-examine Anna a second time after she had been re-cross-examined by the state.

{¶ 100} Evid.R. 611(A) provides, "the court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Trial courts therefore have "wide latitude" to impose reasonable limits on the examination and cross-examination of a witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 170.

{¶ 101} Ritchie's alleged error occurred at a time during trial when Ritchie had already questioned Anna on direct examination and the state had cross-examined Anna. Ritchie then preformed a re-direct examination of Anna, and the state asked questions on re-cross-examination. The state, on re-cross examination, asked Anna whether she told detectives during her interview that she and Ritchie could hear Austin in his room asking to be let out on the evening he was burned. Anna answered, "yes." Ritchie then asked the trial court for the opportunity to question Anna for a third time, and the state objected.

{¶ 102} During a sidebar, the trial court denied Ritchie's request to pose any more questions to Anna and concluded her testimony. Ritchie proffered the questions he would have liked to ask if permitted to continue. The proposed questions were specific to whether

Anna was telling the truth during her interview with detectives. Such questions, however, would have been repetitive and cumulative. Anna already gave testimony on both direct and cross-examination regarding her honesty during her interviews with the two different detectives. She also testified to the extent she was more open and truthful as the interviews progressed.

{¶ 103} Anna had been questioned multiple times by both parties regarding whether she and Ritchie were able to hear Austin crying and pleading to be let out of his room. Thus, the subject and content of the questions Ritchie wanted to ask on a third examination would have been redundant, and Ritchie suffered no prejudice by not being able to pose more of the same questions. The trial court did not abuse its discretion in concluding Anna's testimony, Ritchie was not denied a fair trial, and his due process rights were not violated.

**Incomplete Exhibit**

{¶ 104} Ritchie lastly claims that he was denied due process because the trial court admitted an incomplete document as evidence. The trial court admitted into evidence a list of text messages exchanged between Anna and Ritchie on the day Austin was burned, as offered by the state. Ritchie claims that the admission of this evidence denied him a fair trial because the document was not a complete listing of the text messages, and instead, summarized the exchange of text messages to the state's benefit.

{¶ 105} However, the record clearly indicates that the summary of messages did not violate Ritchie's right to due process. The defense addressed other text messages with Anna not listed on the summary, including text messages sent the day before Austin was burned. The trial court did not deny Ritchie the opportunity to address other text messages. If Ritchie believed the noninclusion of other text messages would be prejudicial, he had the opportunity to raise the issue of any other text messages he believed relevant.

{¶ 106} Furthermore, the record indicates that the same text messages that Ritchie

now claims were only beneficial to the state were the basis of Ritchie's argument that Anna's text messages did not describe an emergency situation. For example, the defense referenced Anna's text in which she stated she was ready to eat to suggest that Anna was more concerned with dinner than she was with Austin's injuries. The defense also argued that other text messages from Anna convinced Ritchie that Austin's injuries did not need medical attention and that Austin would be "fine." As such, both parties used the same text messages, and the listing of the exchange between Ritchie and Anna was incorporated into the arguments of both Ritchie and the state. The exhibit simply documented text messages exchanged between Anna and Ritchie. Thus, the trial court's admission of the exhibit did not deny Ritchie a fair trial.

{¶ 107} After reviewing the record and considering each of Ritchie's arguments, we find Ritchie was denied neither a fair trial nor due process of law. As such, Ritchie's first assignment of error is overruled.

{¶ 108} Assignment of Error No. 3:

{¶ 109} THE CUMULATIVE EFFECT OF THE ERRORS OF THE TRIAL COURT PREVENTED THE APPELLANT FROM RECEIVING A FAIR TRIAL.

{¶ 110} Ritchie argues in his final assignment of error that the cumulative effect of his claimed errors denied him a fair trial.

{¶ 111} According to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 105. However, because we have found that no errors occurred during Ritchie's trial that were not otherwise immediately cured, we find that he was not deprived of a fair trial, and the cumulative error doctrine is inapplicable. Ritchie's final assignment of

error is therefore, overruled.

{¶ 112} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.